**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| HELENE O'DONNELL, | : | |
| | : | |
| Plaintiff, | : | **CIVIL ACTION** |
| v. | : | |
| | : | **NO. 11-3231** |
| PASSPORT HEALTH | : | |
| COMMUNICATIONS, INC., | : | |
| | : | |
| Defendant. | : | |
| | : | |
| | : | |

**MEMORANDUM OPINION**

Tucker, J.                                                            April ___, 2013

Presently before the Court are cross-motions for summary judgment: Plaintiff's Motion

for Partial Summary Judgment (Doc. 51); Defendant's Response in Opposition (Doc. 68);

Plaintiff's Reply (Doc. 72); Defendant's Motion for Summary Judgment (Doc. 66); Plaintiff's

Response in Opposition (Doc. 69); and Defendant's Reply (Doc. 71).  Upon consideration of the

parties' motions with briefs and exhibits, and for the reasons set forth below, Plaintiff's motion

will be *denied* in its entirety and Defendant's motion will be *granted in part and denied in part*.

## I.  FACTUAL BACKGROUND[1]

Plaintiff Helene O'Donnell ("O'Donnell"), a Pennsylvania resident, brings suit against

her former employer Defendant Passport Health Communications, Inc. ("Passport"), a Delaware

corporation that is headquartered in Franklin, Tennessee.

---

[1] Unless noted otherwise, the following facts are undisputed.

On or about September 6, 2006, O'Donnell began her employment with Passport as a sales executive, an at-will position. For about five years, from September 6, 2006 to January 6, 2011, O'Donnell worked from her home and reported to Passport's office located in King of Prussia, Pennsylvania. In 2009, Charles Penrose ("Penrose"), Vice President of Sales for Healthworks (a division of Passport) became O'Donnell's supervisor. Penrose was also based at the King of Prussia office. Throughout her employment, O'Donnell's compensation consisted of her base salary, commissions, and other benefits. At Passport, eligibility for commissions is governed by Passport's Sales Compensation Plan Document (the "Plan"). Pursuant to the Plan, employees must be employed at the time of payment to receive commissions. O'Donnell signed an acknowledgment of the Plan.

Beginning in August 2010, Passport's President and CEO Scott MacKenzie ("MacKenzie") began working with Scott Bagwell ("Bagwell"), Senior Vice President of Sales and Marketing, to reorganize the sales force. This reorganization included eliminating the separate sales teams, including that in King of Prussia, and instead building a larger national sales team. Penrose learned of the potential King of Prussia sales force elimination in August 2010, at which time he discussed the possibility with O'Donnell. Penrose received confirmation in October that the eliminations would occur, including O'Donnell's position, and informed O'Donnell.

On January 6, 2011, O'Donnell was advised that due to this reorganization, her position was being eliminated as of this date. O'Donnell was offered two alternatives: she could accept a severance agreement and leave Passport or she could accept an alternative sales position as a Regional Vice President as part of the national sales team based in Franklin, TN. O'Donnell was advised that in order to accept the new position, she would be required to sign the offer letter and

a non-competition agreement ("non-compete"). O'Donnell was familiar with the non-compete as she had received a copy months prior to January when everyone else in the company also received it. However, O'Donnell did not sign the non-compete at that time either.

O'Donnell requested that she be able to have the opportunity to have an attorney review the non-compete, and she also requested an increase in her base salary to reflect the increase in her job-related responsibilities. Passport gave O'Donnell until January 10, 2011 to accept the offer and sign the non-compete. On January 8, 2011, Vera Payne ("Payne"), Passport's Human Resources Manager, sent O'Donnell an email containing copies of her offer letter, job description, the Plan, and the non-compete agreement. Payne also reiterated the January 10, 2011 deadline to accept the position. On January 10, 2011, Payne sent a follow-up email because O'Donnell had not responded to her email or accepted the position. Later that afternoon, O'Donnell called Payne to explain she could not yet accept the position.

It is here that the parties' version of events begins to diverge. Passport contends that from January 11, 2011 to January 19, 2011, O'Donnell continued to refuse to accept the new position and sign the non-compete. O'Donnell claims that between January 11, 2011 and January 19, 2011, she was awaiting a response from Bagwell or Payne regarding her request for an increase in salary and her proposed revisions to the non-compete agreement. O'Donnell also claims that from January 6, 2011 until she was terminated on January 28, 2011, she assumed the responsibilities of her new position as Regional Vice President — even though she had not yet signed the offer or the non-compete.

The parties agree that on January 19, 2011, Payne received an email from O'Donnell, attached to which was a doctor's note stating that O'Donnell would not be able to work until at least January 31, 2011. It subsequently became clear that O'Donnell was being treated for

anxiety and panic attacks. In addition, O'Donnell's return date was later revised to February 2, 2011. On January 21, 2011, O'Donnell and Bagwell exchanged emails and phone calls regarding the position and new salary, and Bagwell agreed to increase O'Donnell's base salary by $5,000. Later that same day, Payne sent O'Donnell an email containing the offer (revised to reflect the proposed increase in salary) and the non-compete. Payne's January 21, 2011 email emphasized that O'Donnell had until January 28, 2011 to accept the offer, and also reiterated the deadline for O'Donnell to accept the severance agreement in the event she chose not to accept the offer. Payne's email further emphasized that if Passport did not receive the signed offer letter and non-compete by January 28, 2011, Passport would assume O'Donnell had declined the job offer and it would be revoked. Payne also followed up with O'Donnell via telephone that evening.

On January 27, 2011, Payne sent a reminder email to O'Donnell which indicated that Passport was still expecting a response by January 28, 2011 and reminded O'Donnell to sign the appropriate documents. The next day, January 28, 2011, O'Donnell sent Payne a fax stating the following: "I assure you that I am not voluntarily resigning my employment and that I am fully involved in beginning work as the Regional VP, Sales." However, O'Donnell did not to execute the offer letter and the non-compete agreement, despite knowing that this was required to formally accept the position. In the same fax, O'Donnell also stated she had been working in the position since January 6, 2011. Later that same day, Payne sent two emails to O'Donnell indicating that she needed to formally accept the position by signing the documents by close of business that day or the offer would be revoked. O'Donnell did not sign the documents. Accordingly, by letter dated February 1, 2011, Passport notified O'Donnell that her failure to execute the necessary documents resulted in her termination as of January 28, 2011.

## II.  <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate where the moving party establishes that "there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); <u>see</u> <u>also</u> <u>Levy v. Sterling Holding Co., LLC</u>, 544 F.3d 493, 501 (3d Cir. 2008).  A factual dispute between the parties will not defeat a motion for summary judgment unless it is both genuine and material. <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986); <u>Dee v. Borough of Dunmore</u>, 549 F.3d 225, 229 (3d Cir. 2008).  A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit. <u>See</u> <u>Anderson</u>, 477 U.S. at 248; <u>Fakete v. Aetna, Inc.</u>, 308 F.3d 335, 337 (3d Cir. 2002).

The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its burden of proof. <u>See</u> <u>Celotex v. Catrett</u>, 477 U.S. 317, 327 (1986).  Once the moving party has carried its burden under Rule 56, "its' opponent must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007). Under Fed. R. Civ. P. 56(e), the opposing party must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings. <u>See</u> <u>Martin v. Godwin</u>, 499 F.3d 290, 295 (3d Cir. 2007).

At the summary judgment stage the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. <u>See</u> <u>Anderson</u>, 477 U.S. at 249; <u>Jiminez v. All American Rathskeller, Inc.</u>, 503 F.3d 247, 253 (3d Cir. 2007).  In doing so, the court must construe the facts and inferences in the light most favorable to the non-moving party. <u>See</u> <u>Horsehead Indus., Inc. v. Paramount Communications,</u>

Inc., 258 F.3d 132 (3d Cir. 2001). The court must award summary judgment on all claims unless the non-moving party shows through affidavits or admissible evidence that an issue of material fact remains. See, e.g., Love v. Rancocas Hosp., 270 F.Supp.2d 576, 579 (D.N.J. 2003); Koch Materials Co. v. Shore Slurry Seal, Inc., 205 F.Supp.2d 324, 330 (D.N.J. 2002).

## III. <u>DISCUSSION</u>

O'Donnell's Complaint asserts five claims against Passport. First, O'Donnell alleges that Passport violated her entitlement to medical leave under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2611 et seq., through interference and retaliation. Secondly, O'Donnell claims that Passport breached the terms of her employment by unlawfully terminating her while she was out due to illness, and refusing to compensate her for payments owed to her. Third, O'Donnell claims that Passport was unjustly enriched by O'Donnell's services, experience, and efforts to generate revenue for its benefit. Forth, O'Donnell claims that Passport violated Pennsylvania's Wage Payment and Collection Law ("WPCL"), 43 P.S. 260.9(a), again by failing to compensate her. Fifth and finally, O'Donnell alleges that the conduct of Passport constituted intentional infliction of emotional distress. O'Donnell has moved for partial summary judgment on her FMLA and WCPL claims. Passport has moved for summary judgment on all of O'Donnell's claims. The Court will examine each claim in turn.

### A.    Violation of Family Medical Leave Act ("FMLA") (Count I)

The FMLA grants eligible employees the right to take up to twelve workweeks of leave in any twelve-month period if a "serious health condition ... makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). Even when these qualifying circumstances exist, employees cannot invoke rights under the FMLA if they fail to provide adequate notice of their need for leave. 29 U.S.C. § 2612(e). When the need for

leave is unforeseeable, employees are obligated to notify their employer "as soon as practicable," 29 C.F.R. § 825.303(a), and "provide sufficient information for an employer to reasonably determine whether the FMLA may apply." 29 C.F.R. § 825.303(b).

When employees invoke rights protected by the FMLA, employers may not "interfere with, restrain, or deny the exercise of or attempt to exercise" these rights. 29 U.S.C. § 2615(a)(1). Employers also cannot "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful." 29 U.S.C. § 2615(a)(2). "The former provision is generally, if imperfectly, referred to as 'interference' whereas the latter is often referred to as 'retaliation.'" Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294, 301 (3d Cir. 2012) (citing Callison v. City of Philadelphia, 430 F.3d 117, 119 (3d Cir.2005)).

Once these threshold qualifications requirements have been met, the court may consider whether the plaintiff has made out a prima facie case for interference or retaliation. In order to assert a claim of interference, an employee must show that she was entitled to benefits under the FMLA and that her employer impermissibly denied her those benefits. Sarnowski v. Air Brooke Limousine, Inc., 510 F.3d 398, 401 (3d Cir. 2007) (internal citation omitted). To establish a prima facie case of retaliation under the FMLA, a plaintiff must show that (1) she took FMLA leave, (2) she suffered an adverse employment decision, and (3) the adverse decision was causally related to her leave. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 146 (3d Cir. 2004). The Third Circuit has observed:

> Because FMLA retaliation claims require proof of the employer's retaliatory intent, courts have assessed these claims through the lens of employment discrimination law. Accordingly, claims based on circumstantial evidence have been assessed under the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), while claims based on direct evidence have been assessed under the mixed-motive framework set forth in Price Waterhouse v. Hopkins, 490 U.S. 228, 276–77, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (O'Connor, J., concurring). See Conoshenti, 364 F.3d at 147.

Lichtenstein, 691 F.3d at 302.

## 1. Eligible Employee

To be eligible for leave under the FMLA, the employee must be employed at a location where 50 or more employees are employed within 75 miles of that location. 29 U.S.C. §2611(4); 29 C.F.R. § 825.104.[2] Here, it is undisputed that the King of Prussia location did not employ 50 or more employees within a 75 mile radius.[3] It is also undisputed that the Franklin location does employee 50 or more people within a 75 mile radius. As a result, O'Donnell would not be eligible for leave under the FMLA if she were employed by the King of Prussia location.

According to Passport, O'Donnell was assigned to and reported to the King of Prussia location throughout her employment with Passport, and never became an employee of the Franklin office because she never formally accepted that position. Conversely, O'Donnell contends that she transferred to the Franklin office when her position at the King of Prussia office was eliminated on January 6, 2011. Thus, according to O'Donnell, she reported to the Franklin office at the time her request for medical leave was submitted. O'Donnell points to several pieces of evidence to support her argument that she transferred to the Franklin office as of January 6, 2011. First, O'Donnell states that she received an email from her supervisor,

---

[2] For salespersons like O'Donnell with no fixed worksite, the "worksite" is the site to which they are assigned as their home base, from which their work is assigned, or to which they report. 29 C.F.R. § 825.111(a)(2). In applying this standard, many courts use the following factors: (1) from which location the employee sent work-related communications; (2) which location the employee visited regularly; (3) at which location the employee had a desk; (4) whether there was anything on that desk indicating it belonged to the employee; (5) which location had a telephone number listed for the employee; (6) at which location the employee's voicemail account was located; (7) who conducted initial employee interviews; (8) where secondary or final interviews were conducted; (9) where employee training was done; (10) where personnel records were maintained; (11) where paychecks were issued from; (12) where expense reports were turned in; (13) who directly evaluated the employee's performance; and (14) who was ultimately responsible for creating assignments and monitoring progress. Podkovich v. Glazer's Distributors of Iowa, Inc., 446 F.Supp.2d 982, 991 (N.D. Iowa 2006) (citing Cialini v. Nifisk-Advance America, Inc., 2000 WL 230215, *1 (E.D. Pa. 2000)).

[3] The King of Prussia location employed approximately 30 individuals.

Charles Penrose, stating that that as of January 7, 2011 she officially reported to Scott Bagwell.[4] Second, O'Donnell argues that because Bagwell sent her a "lead" on an account, her work was assigned by Bagwell out of the Franklin office.

The Court finds that there is conflicting evidence as to whether O'Donnell was employed by the Franklin office. The roughly three week period between January 6, 2011 (the day O'Donnell's position at the King of Prussia office was eliminated) and January 28, 2011 (the day O'Donnell was terminated) represents something of a gray area. On the one hand, it is unquestioned that O'Donnell never completed the steps necessary to formally accept the position in Franklin. On the other hand, it would appear that everyone involved was working under the assumption that O'Donnell *would be* accepting the position at the Franklin office as soon as negotiations regarding the terms of her offer were hashed out. Thus, irrespective of the current dispute over what office and to whom O'Donnell was reporting, O'Donnell continued to work during this three week period, and Passport permitted her to do so even though she had not executed the requisite documents. If in fact O'Donnell was not working for the Franklin office, it would be fairly easy for Passport to prove as much. For instance, Passport could have submitted O'Donnell's final paycheck to the Court, which presumably would indicate that the last day O'Donnell was paid for was January 6, 2011. Instead, Passport attempts to argue that O'Donnell was working for the King of Prussia office (even though, according to Payne, the King of Prussia office no longer existed as of January 6, 2011) and O'Donnell continued to be paid up until January 28, 2011.[5] This is simply nonsensical. The Court will find that O'Donnell

---

[4] Penrose, however, testified that he only sent the email to O'Donnell because he mistakenly assumed that she was accepting the offer. (Penrose Dep. 73:7-9.)

[5] In its reply brief, Passport states "Passport paid Plaintiff for every day she was allegedly out of work due to a 'medical condition' until she failed to meet the deadline required to accept the new position." (Def.'s Reply 5.)

worked for the Franklin office during this three week period under an implied-in-fact contract. O'Donnell is therefore an eligible employee under the FMLA because Franklin office employees 50 or more employees within 75 miles.

## 2. Notice of a Serious Health Condition

Passport next argues that even if O'Donnell was an eligible employee under the FMLA, she failed to put Passport on notice of her need for leave. Passport does not dispute that O'Donnell's treating physician, Dr. Edward DaVeiga, submitted a letter to Passport on O'Donnell's behalf. However, Passport contends that "merely" sending a doctor's note without evidence of a serious medical condition is not enough to trigger an employer's obligations under the FMLA. The question before the Court, therefore, is whether O'Donnell provided legally sufficient notice to entitle her to benefits under the FMLA.

An employee seeking leave under § 2612(a)(1)(D) "shall provide the employer with not less than 30 days' notice, before the date the leave is to begin, of the employee's intention to take leave under such subparagraph, except that if the date of the treatment requires leave to begin in less than 30 days, the employee shall provide such notice as is practicable." 29 U.S.C. § 2612(e)(2)(B). As the Third Circuit has stated, "[t]he critical question is whether the information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition." Sarnowski, 510 F.3d at 402 (quoting Manuel v. Westlake Polymers Corp., 66 F.3d 758, 764 (5th Cir. 1995)). Further,

> [i]n providing notice, the employee need not use any magic words. The critical question is how the information conveyed to the employer is reasonably interpreted. An employee who does not cite to the FMLA or provide the exact dates or duration of the leave requested nonetheless may have provided his employer with reasonably adequate information under the circumstances to understand that the employee seeks leave under the FMLA.

Id. In the instant case, the entire content of Dr. DaVeiga's letter was as follows:

January 19, 2011

Re: HELENE O[']DONNELL

To Whom It May Concern:

I saw Mrs[.] O[']Donnell today in clinic for a medical condition, [and] she will need to be out of work until at least January 31st 2011 to recuperate from her condition. She will return to see me in follow up at that time and I will assess at that time if she may resume work. If you have any questions please do not hesitate to contact me.

(Def.'s Resp. in Opp'n to Pl.'s Mot. Summ. J., Ex. I.) The Court finds that Dr. DaVeiga's letter

provided Passport with sufficient notice of a serious health condition. It is true, as Passport

argues, that Dr. DaVeiga's letter does not specify what medical condition O'Donnell was

suffering from. It is also true that "[w]here courts have found notice to be deficient, it has been

because the employee failed to convey the reason for needing leave." Sarnowski, 510 F.3d at 403

(internal citations omitted). However, the letter adequately informed Passport that O'Donnell

was being treated for a "medical condition" that would require her to be off from work for at

least twelve days, if not more. The letter placed Passport on notice that there was a probable

basis for FMLA leave. If Passport had any doubts as to whether O'Donnell's request for leave

qualified under FMLA, the burden was on Passport to request additional information from

O'Donnell or Dr. DaVeiga in order to substantiate or clarify the need for leave. 29 C.F.R. §

825.208(e)(2); Aubuchon v. Knauf Fiberglass GmbH, 359 F.3d 950, 953 (7th Cir. 2004) (citing

29 C.F.R. §§ 825.302(c), 825.303(b), (d); Cavin v. Honda of America Manufacturing, Inc., 346

F.3d 713, 723-24 (6th Cir.2003)); see also Hayduk v. City of Johnstown, 580 F. Supp. 2d 429,

457 (W.D. Pa. 2008); Peter v. Lincoln Technical Inst., Inc., 255 F.Supp.2d 417, 441 (E.D. Pa.

2002). Indeed, Passport did just that. Payne testified that she followed up with O'Donnell as to

what additional information would be needed in order to place her on leave, and as of January

20, 2011 (just one day after Passport received Dr. DaVeiga's letter) O'Donnell was placed on

leave. (Payne Dep. 124:1-125:3.) It is difficult to understand how Passport can now argue that O'Donnell did not provide it with sufficient notice of her need for leave when Passport did, in fact, grant O'Donnell leave. Passport's argument fails.

### 3. Interference

The Court will next consider whether O'Donnell has established that Passport interfered with her ability to take FMLA leave. As previously stated, in order to assert a claim of interference, an employee must show that she was entitled to benefits under the FMLA and that her employer impermissibly denied her those benefits. Sarnowski, 510 F.3d at 401 (internal citation omitted).

The Court, in discussing O'Donnell's status as an eligible employee and the fact that she provided adequate notice of her serious health condition, *supra*, has already made a determination that O'Donnell qualified for and was entitled to benefits under the FMLA. O'Donnell in fact was placed on leave by Passport on January 20, 2011, and remained on leave until she was terminated on January 28, 2011. However, the Court does not find that Passport denied her the benefits under FMLA. Accordingly, O'Donnell cannot satisfy the second prong of the interference analysis. O'Donnell's entire interference claim is limited to her assertion that Passport "interfered with the FMLA leave by not allowing her to rest and remove herself from the stress that was causing her panic attacks." (Pl.'s Resp. in Opp'n to Def.'s Mot. Summ. J. 14.) Specifically, O'Donnell argues that it was interference for Payne and Bagwell to continue to communicate with her regarding the outstanding employment offer while she was on leave.

The Court wholly rejects this argument. O'Donnell knew, prior to going on leave, that in order to formally accept the position in Franklin, she needed to sign the employment offer and sign the non-compete agreement. (O'Donnell Dep. 140:1 -24.) Moreover, O'Donnell knew she

needed to execute the necessary documents for two whole weeks prior to going on leave. When she did not sign the documents by January 10, 2011, she was given an extension until January 28, 2011. According to O'Donnell, she did not sign the documents by the initial January 10, 2011 deadline because she was negotiating her salary with Bagwell and wanted to have an attorney review the non-compete agreement.[6] Payne's communications with O'Donnell after January 20, 2011 served only to remind O'Donnell that she had until January 28, 2011 to sign the documents. Bagwell's communications with O'Donnell after January 20, 2011 were limited to negotiating O'Donnell's salary with her — negotiations that O'Donnell herself initiated and which only continued into O'Donnell's leave period because for two weeks prior to going on leave she had repeatedly refused to sign the documents. These communications do not constitute interference. O'Donnell has made no allegation (and the record does not support the inference) that anyone at Passport requested or otherwise attempted to pressure her into returning to work. Moreover, O'Donnell has cited no authority supporting her contention that an employer is not permitted to have any contact whatsoever with an employee while the employee is out of leave.

O'Donnell has failed to establish any evidence that supports her claim that Passport illegitimately prevented her from exercising her rights under the FMLA. O'Donnell had an obligation to timely respond to the offer of employment, had she chosen to accept it. Passport was under no obligation to grant O'Donnell the first extension. Likewise, Passport was under no obligation to grant O'Donnell another extension after she went on leave. A request for leave does not provide O'Donnell with benefits she would not be entitled to without such a request.

---

[6] As previously stated, Bagwell agreed to increase O'Donnell's base salary by $5,000 on January 21, 2011. With respect to the non-compete agreement, O'Donnell testified she did not recall whether she submitted any changes to the non-compete. (O'Donnell Dep. 170:14-17.) Conversely, Bagwell and Payne both specifically testified that O'Donnell never submitted or discussed changes with them. (Bagwell Dep. 154:15-18; Payne Dep. 139:10-15).

Accordingly, O'Donnell was not entitled to a longer consideration period due to the leave request, as a deadline was repeatedly given to her beginning weeks before the leave request. Therefore, O'Donnell cannot establish an interference claim under the FMLA, and summary judgment is granted in favor of Passport on this claim.

### 4. Retaliation

The Court next considers whether O'Donnell can prove that Passport retaliated against her for taking FMLA leave. As previously stated, courts analyze FMLA retaliation claims based on circumstantial evidence under the familiar burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this scheme: (1) the plaintiff bears the initial burden of establishing a prima facie case of discrimination; (2) the burden of production then shifts to defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action; and (3) if defendant meets its burden of production, plaintiff must prove by a preponderance of the evidence that defendant's proffered reason was a pretext for discrimination. McDonnell Douglas, 411 U.S. at 802, 93 S.Ct. 1817. To establish a prima facie case of retaliation under the FMLA a plaintiff must show that (1) she took an FMLA leave, (2) she suffered an adverse employment decision, and (3) the adverse decision was causally related to her leave. Conoshenti, 364 F.3d at 146.

The Court finds that O'Donnell cannot make out a prima facie case of retaliation because no causal connection exists between O'Donnell's termination and her request for leave. O'Donnell has offered no evidence to suggest, much less establish, that the real reason for termination was her request for leave. Rather, O'Donnell merely avers that "an unusually suggestive proximity in time between the protected activity and the adverse action may be sufficient, on its own, to establish the requisite causal connection." (Pl.'s Resp. in Opp'n to

Def.'s Mot. Summ. J. 10.) (citing <u>Lichtenstein</u>, 691 F.3d at 301; <u>Jalil v. Avdel Corp.</u>, 873 F.2d 701, 703 (3d Cir. 1989); <u>Treaster v. Conestoga Wood Specialties, Corp.</u>, 4:09-CV-00632, 2010 WL 2606479 (M.D. Pa. Apr. 29, 2010) <u>report and recommendation adopted sub nom.</u> <u>Treaster v. Conestoga Wood Specialties Corp.</u>, 4:09-CV-632, 2010 WL 2606481 (M.D. Pa. June 25, 2010); <u>Whitman v. Proconex, Inc.</u>, CIV.A.08-2667, 2009 WL 141847 (E.D. Pa. Jan. 20, 2009)). Specifically, O'Donnell argues that less than two days after she advised Passport of her request for leave, Passport took steps to terminate her.[7] O'Donnell claims that this two day period is "unusually suggestive," creates an inference of causality, and defeats Passport's motion for summary judgment.

The Court disagrees. It is true that O'Donnell was terminated by Passport a short eight days after requesting leave. However, O'Donnell's request for leave had nothing to do with her termination. Passport made it abundantly clear to O'Donnell prior to her request for leave that she needed to make a decision and sign the appropriate paperwork by January 10, 2011, which was later extended to January 28, 2011, to accept the position offered to her. O'Donnell's medical leave was irrelevant to whether or not O'Donnell's employment was terminated. O'Donnell was repeatedly notified prior to providing a doctor's note that she needed to execute the offer letter and non-compete to accept the position or the offer would be revoked and her employment would be terminated. Again, the potential outcome of termination was made clear to O'Donnell from the beginning, on January 6, 2011, when she was informed she must sign the documents. Because she failed to do so by the given deadline, her employment was terminated

---

[7] It appears O'Donnell is relying on Payne's email dated January 21, 2011 (which reminded O'Donnell of the deadline to accept the offer and advised her that she would be terminated if she did not accept) in arriving at her conclusion that that Passport began termination proceedings two days after O'Donnell requested leave.

without regard to any request for leave. O'Donnell's reliance on the temporal proximately between her request for leave and her termination is therefore misplaced.

Further, even assuming O'Donnell could prove a prima facie case of retaliation, Passport is clearly able to articulate a legitimate, nondiscriminatory reason for terminating O'Donnell: her failure to execute the necessary documents. O'Donnell cannot prove that that this reason is pretextual because she herself has admitted that she knew what needed to be done in order to formally accept the position and she chose not to do so by the stated deadline.

Thus, O'Donnell's retaliation claim also fails, and summary judgment is granted in favor of Passport.

**B.    Breach of Terms of Employment (Count II) and Violation of Wage Payment and Collection Law ("WPCL") (Count IV)[8]**

O'Donnell next argues that Passport breached the terms of her employment because, after Passport terminated her, it refused to pay her certain compensation that was due to her. According to O'Donnell, this compensation included the payment of commissions, paid time off, and reimbursement for business expenses.

**1.   Sales Commissions**

Pennsylvania's Wage Payment and Collection Law provides:

> Whenever an employer separates an employe[e] from the payroll, or whenever an employe[e] quits or resigns his employment, the wages or compensation earned shall become due and payable not later than the next regular payday of his employer on which such wages would otherwise be due and payable.

43 Pa. Stat. § 260.5. The term "wages" includes commissions. 43 Pa. Stat. § 260.2a.

Importantly, the WPCL does not create an employee's substantive right to compensation.

---

[8] The Court will consider Counts II and IV together because it appears that O'Donnell is arguing that one of the means by which Passport breached the terms of her employment was through violation of the Wage Payment Collection Law.

Rather, it only establishes an employee's right to enforce payment of wages or compensation to which an employee is otherwise entitled by the terms of an agreement.  See Kafando v. Erie Ceramic Arts Co., 2000 PA Super 377, 764 A.2d 59, 61 (Pa. Super. Ct. 2000) (internal citation omitted); Banks Eng'g Co., Inc. v. Polons, 697 A.2d 1020, 1024 (Pa. Super. Ct. 1997) (internal citations omitted).  The WPCL therefore only applies to "back wages already earned." Weingrad v. Fischer & Porter Co., 47 Pa. D. & C.2d 244, 250 (Pa. Com. Pl. 1968).  The contract between the parties governs whether specific wages or commissions are "earned." Sendi v. NCR Comten, Inc., 619 F. Supp. 1577, 1579 (E.D. Pa. 1985) aff'd sub nom. Sendi v. N.C.R. Comten, Inc., 800 F.2d 1138 (3d Cir. 1986) (internal citations omitted); see also Allende v. Winter Fruit Distributors, Inc., 709 F. Supp. 597, 599 (E.D. Pa. 1989).

In the instant matter, O'Donnell avers that she is entitled to commissions she allegedly earned during the fourth quarter 2010. As previously stated, at Passport's commission payments are governed by the Sales Compensation Plant Document (the "Plan").  Pursuant to the Plan, "[e]mployees must be employed at the time of payment to *receive* commissions." (Def.'s Resp. in Opp'n to Pl.'s Mot. Summ. J., Ex. D, pg. 2.) (emphasis added).  It is undisputed that O'Donnell acknowledged and accepted the terms of the Plan.  In this particular case, O'Donnell's employment ended on January 28, 2011.  However, commissions for the fourth quarter of 2010 were not paid until February 15, 2011.  Accordingly, Passport contends that O'Donnell is not entitled to commission payments for the fourth quarter 2010 because she was not employed with the company on February 15, 2011, as required by the Plan.  O'Donnell argues that she is entitled to the commissions because the provision of Plan requiring that

employees be employed on the distribution date in order to receive commissions is a "forfeiture clause" that is invalid §260.7 of the WPCL.[9]

The Court first notes that, as articulated in <u>Sendi</u>, the contract between the parties governs whether specific wages or commissions are to be considered "earned." 619 F. Supp. at 1579. However, the Plan in question here specifically states that it "is not intended to be, nor should it be construed as, a contract between Passport and any Passport employee. Rather, the Commission Plan serves only to provide information to affected employees as to how their commission, if any, will be computed and paid." (Def.'s Resp. in Opp'n to Pl.'s Mot. Summ. J., Ex. D, pg. 2.) It is difficult to know what consideration to give an agreement (signed and acknowledged by both O'Donnell and Bagwell on behalf of Passport) that somehow manages to disavow that it an agreement or contract. It is especially difficult to know what consideration to give such an agreement when Passport now attempts to enforce a provision of that agreement even though it, as the drafter of the agreement, initially claimed was *not* a contract. Even more problematic is the fact that, in the Court's view, the Plan is silent as to precisely when commissions are considered "earned." There is, therefore, a genuine issue of material fact as to this question, and the Court declines to enter summary judgment on this claim in favor of either party.

First, the Court declines to enter summary judgment in Passport's favor because there is a genuine issue as to whether the Plan's requirement that employees must be employed at the time of quarterly payment to receive commissions constitutes a "forfeiture clause" that is invalid under the WPCL. Passport denies that the provision constitutes a forfeiture clause, and asserts

_____

[9] Section 260.7 provides, in relevant part: "No provision of this act shall in any way be contravened or set aside by a private agreement." 43 Pa. Stat. § 260.7.

18

that a forfeiture clause only exists if it "deprives an employee of commissions already earned." (Def.'s Resp. in Opp'n to Pl.'s Mot. Summ. J. 5.) However, Passport claims, "under the Plan, commissions are not 'earned' until paid; that is, employees must be employed at the time of payment to be eligible to receive commissions." Id.  The Court rejects Passport's argument that "commissions are not 'earned' until paid."  Nowhere in the Plan is it stated that "commissions are not earned until paid," and Passport cannot now add language to the Plan that does not exist simply because the issue is being litigated.  Paying commissions on a quarterly schedule is convenience for employers, but the distribution date in and of itself does not conclusively prove that payments are not "earned" until that date.  Moreover, the Court finds this particular argument to be circular.  In the most technical sense, it is true that commissions are not "earned" (in the sense of being received by the employee) until they are paid out.  However, it is entirely possible that, under Passport's Plan, commissions are "earned" (in the sense of being vested) at some point in time prior to the quarterly payout date of the commissions.  A reasonable jury could find that commissions had already been "earned" by O'Donnell even though the formality of paying out the commissions had not yet occurred.

Further, the Court agrees with O'Donnell that the cases cited Passport in support of its position that O'Donnell's commissions had not been "earned" are all distinguishable from the facts of this case. Passport first approvingly cites Stebok v. Am. Gen. Life & Acc. Ins. Co., 715 F. Supp. 711 (W.D. Pa. 1989) aff'd, 888 F.2d 1382 (3d Cir. 1989), in which an employee sued a former employer for, among other things, the balance of his weekly compensation "pool" (essentially an accumulation of the employee's commissions). Stebok, 715 F.Supp. at 712. The employer moved for summary judgment on the employee's claim for the balance of the pools, contending that the provisions of the employment contract unambiguously stated that the

employee is not entitled to any commission or amounts credited to the pools which were unpaid at the time of the termination of employment. Id. at 713. The court granted summary judgment in favor of the employer. Stebok is distinguishable from this case, however, because the employment contract in that case (1) expressly stated commissions were not vested and (2) the employee received weekly compensation in lieu of commission payments. Id. at 712-713. Neither factor is present here.

Passport next cites the aforementioned Sendi, 619 F. Supp. 1577, in which a regional sales director sued his former employer for unpaid commissions. Under the terms of the Compensation Plan Agreements in Sendi, employees qualified for 50% of the commission at the time the contract was accepted by the customer and the remaining 50% when the equipment was accepted by the customer and became Certified Ready for Use. The plan in Sendi expressly provided that commissions "are not earned until paid" and that employees "forfeit all rights to commissions which have not been paid at termination of employment." Id. at 1580. The plaintiff had received 50% of some commissions, but was terminated before some sales became Certified Ready for Use, a precondition for receiving the other 50% of the commission. Id. The employee argued to the court that since the WPCL requires the payment of all wages or compensation earned, he was entitled to commission for all contracts attributable to his labor, and that the plan's requirements cannot be applied to deprive him of such commission. The court rejected this argument, and granted summary judgment in favor of the employer, reasoning that "[s]ince the WPCL does not purport to outline what compensation is due in any particular case, a contractual restriction on when commissions are earned does not frustrate the statute's purpose. Id.

The Court likewise finds <u>Sendi</u> to be inapplicable.  The contract in <u>Sendi</u> was abundantly clear that there was a two-step process for earning commissions: 50% was earned when the contract was signed, and the remaining 50% was earned when the equipment was accepted and Certified Ready for Use.  Under the clear terms of the contract, the employee was not entitled to the remaining 50% because he was terminated before reaching the second step.  Here, setting aside the fact that the Plan purports not to even be a contract, the Plan does not contain similarly clear delineations as to when commissions are earned.  As previously emphasized, the Court finds unpersuasive Passport's insistence that the Plan should be read as stating "commissions are not earned until paid."

Passport then goes on to cite the aforementioned <u>Kafando</u>, 2000 PA Super at 764 A.2d at 59, in which employee was a part of a "gainsharing" program in which employees could receive a bonus in addition to their regular wages.  Under the  express terms of the employee handbook, an employee must not only have worked during the period in which the gainsharing sum was calculated, but also must have been in the company's employ on the date of distribution of gainsharing checks. <u>Id.</u> at 60.  The plaintiff was terminated prior to the distribution of the gainsharing checks and did not receive a check. <u>Id.</u>  The superior court affirmed the trial court denial of the employee's motion for summary judgment.

<u>Kafando</u> is inapplicable because that case was decided on the grounds that the gainsharing program (essentially a profit-sharing scheme) did not qualify as earnings by an employee within the meaning of the WPCL. <u>Id.</u> at 61-62.  Accordingly, the court did not even reach the question of whether the conditions stated in the employee handbook constituted a forfeiture clause under the WPCL.  Here, however, Passport does not dispute that commissions are compensation that is covered by the WPCL.

Similarly, in Gudleski v. PPL Elec. Utilities, 2005 WL 6524810 (2005) (the next case cited by Passport), the plaintiff argued that his former employer owed him money under the company's Variable Pay Plan. Gudleski, 2005 WL 6524810, at *1 (Pa.Com.Pl.2005). The plan indicated that employees who left the company "before the variable award for that year is paid for reasons other than death, disability, conversion to part-time status or retirement" forfeit their right to receive such a payment. Id. The Gudleski court, citing Kafando, held that the "variable pay" the employee was trying to recover was not compensation within the meaning of the WPCL. As in Kafando the money allegedly owed was designed to compensate for departmental, not individual, performance. Thus, again as in Kafando, the court did not address the question of whether the forfeiture provision violated the WPCL because the threshold requirement of finding "wages" was not satisfied.

In addition, the Court also declines to enter summary judgment on this count in Plaintiff's favor because there is a genuine issue of material fact as to whether the commissions were in fact "earned" at some point in time prior to the distribution date. If the commissions were earned, the question still remains as to whether the provision of the Plan requiring that the employee be employed on the date of distribution constitutes a forfeiture clause that is invalid under the WPCL. Plaintiff has stated that she understood the primary focus of the job to be closing sales on targeted accounts, and that her sales commissions were earned at the time of signing the contract with a customer. However, at his deposition, Passport's President and CEO Scott MacKenzie stated that commissions are earned after the client has signed a contract, *and* revenues are received by Passport. (MacKenzie Dep. 180:14- 181:15.)[10] This suggests that there

---

[10] Specifically, MacKenzie testified:

> Q:    Do you believe that salespeople should be paid for the efforts that they made for sales?

could have been a two-step process for earning commissions, neither of which includes waiting until the distribution date.  Deciding between these two alternate versions of the facts is a question for the jury.

### 2.  Paid Time Off ("PTO") and Reimbursement of Expenses

Under the WPCL, "fringe benefits or wage supplements" includes vacation and holiday time and reimbursement for expenses. 43 P.S. §260.2a. The term "wages'" also includes fringe benefits or wage supplements. Id.  PTO and reimbursement offered under any employee benefit plan are therefore protected classes of compensation of the WPCL.

O'Donnell argues that, pursuant to Passport's employee handbook, eligible employees (*i.e.* regular full time employees) may accrue up to 120 hours of PTO each year, accrued monthly at the rate of ten hours.  According to O'Donnell, the employee handbook provides that "[u]pon termination of employment, employees will be paid for unused PTO time that has been earned through the last day of work."[11] Plaintiff claims that at the time of her termination, she had unused earned PTO time of 25.9925 hour totaling $874. 65.  O'Donnell contends that Passport has failed to pay her for this unused PTO time that was earned through the last day of her

---

A:      No.
[…]
A:      And so the answer would be no, *I believe we pay based on actual results, the revenues to Passport.  So it's based on the actual sales that occur.*
Q:      Okay.
A:      So efforts are not what we pay for.  *We pay on a signed deal and revenues from those deals.*  I believe they should be paid, but — if you try really hard, but if the contract doesn't get signed, we can't pay for that.
Q:      Okay.  But if there's a contract, they should be —
A:      Yeah.  If they—if they—if they get a contract and we do get revenues.  We do have a problem in our industry, too, in that we're like cell phones….So sometimes we make a sale, but the revenues actually don't work but, because the client doesn't use the service.  *So we pay on, sign the contract and invoices by Passport to the client.*

Id. (emphasis added).

[11] Neither party has attached the employee handbook, or an excerpt from the employee handbook, as an exhibit.  However, Passport has not disputed O'Donnell's contention that the employee handbook so provides.

employment. O'Donnell additionally claims that, in accordance with the employee handbook and policies of the defendant, remote employees are eligible for business expense reimbursement including travel, meals, internet, landline phone expenses, and the like. O'Donnell asserts that prior to her termination, she submitted her expense report to Passport, which included expenses for attending a sales meeting as well as other expenditures in accordance with the policies established by Passport. O'Donnell maintains that Passport has failed to reimburse her for these expenses, which total $1,361.91.

With respect to O'Donnell's claim for unpaid PTO, the only document in the record which concerns this issue is an email exchange between Vera Payne and Dee Durham ("Durham"), Passport's Financial Administration Manager. (Def.'s Reply, Ex. K.) This email exchange includes a computer printout of O'Donnell's "PTO Plans," which includes her "float holiday" and vacation time. As the Court understands this document, the amount of available vacation time that is listed appears to substantiate O'Donnell's position that she is owed 25.9925 hours of vacation time. However, handwritten notes on the printout, as well as the substance of the emails exchanged between Payne and Durham, suggest that O'Donnell actually had no accrued vacation time. Passport has offered no explanation as to how Payne and Durham arrived at this determination; the Court is therefore not in a position to accept Passport's assertion that no PTO time is owed to O'Donnell. As the Court must construe the facts and inferences in the light most favorable O'Donnell as the non-moving party, the Court will deny Passport summary judgment on this issue. Additionally, with respect to O'Donnell's claim that Passport has not reimbursed her for certain business expenses, Passport has not briefed this issue at all. Summary judgment is therefore denied as to this issue as well.

    **C.**    **Unjust Enrichment (Count III)**

As an alternative to her breach of terms of employment claim, O'Donnell asserts a claim for unjust enrichment. Under this theory, O'Donnell claims that because Passport has received and will continue to receive substantial amounts of revenue from sales generated by her, it would be unjust for Passport to retain this benefit without paying her the sales commissions for her efforts.

The trouble with this theory, however, is that "the doctrine of unjust enrichment is inapplicable when the relationship between parties is founded upon a written agreement or express contract." Reynolds v. Univ. of Pennsylvania, 483 F. App'x 726, 734 (3d Cir. 2012) (citing Wilson Area Sch. Dist. v. Skepton, 586 Pa. 513, 895 A.2d 1250, 1254 (2006)). Further, where there is a contract, a plaintiff cannot recover on an unjust enrichment theory no matter how "harsh the provisions of such contracts may seem in the light of subsequent happenings." Third National & Trust Company of Scranton v. Lehigh Valley Coal Company, 353 Pa. 185, 44 A.2d 571, 574 (1945); see also Schott v. Westinghouse Electric Corporation, 436 Pa. 279, 259 A.2d 443, 448 (1969); Wingert et al. v. T.W. Phillips Gas & Oil Company, 398 Pa. 100, 157 A.2d 92, 94 (1959); Durham Terrace, Inc. v. Hellertown Borough Authority, 394 Pa. 623, 148 A.2d 899, 904 (1959). Here, the parties do not dispute that there is a contract (the Sales Compensation Plan Document), entered into by them, which governs the payment of commissions. O'Donnell also does not dispute that the doctrine of unjust enrichment does not apply when there is a contractual relationship between the parties. Nonetheless, O'Donnell cites Hiriam Hicks, Inc. v. Synagro WWT, LLC, 867 F. Supp. 2d 676, 700 (E.D. Pa. 2012) (Dalzell, J.) [hereinafter Hicks] for the following proposition:

> While it is true that the doctrine of unjust enrichment is inapplicable when the relationship between the parties is f[o]unded upon a written or express contract, regardless of how harsh the provisions of such contract may seem in light of subsequent happens, Pennsylvania [c]ourts have held that where the party excused by impossibility

has performed the contract on his side before the impossibility arises[,] justice requires the imposition of a quasi-contract obligation on the party receiving such performance to pay its fair value.

(Pl.'s Resp. in Opp'n to Def.'s Mot. Summ. J. 24.)  The Court finds <u>Hicks</u> to be inapplicable to the facts of the instant case.  In <u>Hicks</u>, the defendant had asserted frustration of purpose as a defense to the plaintiff's breach of contract claim.  Judge Dalzell denied the defendant's motion for summary judgment to the extent that it was based on a *counterclaim* of frustration of purpose, but still permitted the defendant to assert frustration of purpose as a *defense* to plaintiff's breach of contract claim. <u>Hicks</u>, 867 F. Supp. at 701.  Because the defendant was permitted to argue frustration of purpose as a defense, Judge Dalzell permitted the plaintiff's claim for unjust enrichment to survive summary judgment to the extent that it was premised on a defense of impossibility.[12]  In other words, because the defendant was permitted a defense of frustration of purpose, the plaintiff was similarly permitted a defense of impossibility (which in turn permitted its unjust enrichment claim to proceed).[13]  In the case at bar, however, this issue of defenses is

---

[12] Hiriam Hicks, Inc., the plaintiff, had argued that if the defendant was successful in maintaining its frustration of purpose defense, this would effectively mean that the contract in question "would be dissolved, but <u>Hicks</u> would be allowed a claim for restitution.  Unjust enrichment is a quasi-contract doctrine that incorporates the concept of restitution." <u>Hicks</u>, 867 F. Supp. at 700.  Thus, if the contract was impossible to perform, the contract would be dissolved and the unjust enrichment theory could apply as a means of getting restitution.

[13] Frustration of purpose and impossibility are closely related concepts.  The Restatement (Second) of Contracts defines frustration of purpose as follows:

> Where, after a contract is made, *a party's principal purpose is substantially frustrated* without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or the circumstances indicate the contrary.

Restatement (Second) of Contracts: Discharge by Supervening Frustration § 265 (1981).  The Restatement (First) of Contract defined impossibility to mean "not only strict impossibility but impracticability because of extreme and unreasonable difficulty, expense, injury or loss involved." Restatement (First) of Contracts: Definition of Impossibility § 454 (1932).  Accordingly, the Restatement (Second) abandoned the language of "impossibility" and instead focused on "impracticability," defining it as follows:

> Where, after a contract is made, *a party's performance is made impracticable* without his fault by the

not present. Moreover, Plaintiff cannot plausibly argue it was impossible or impractical for her to perform under the terms of the Plan. Thus, summary judgment in granted in favor of Passport on O'Donnell's unjust enrichment claim.

### D. Intentional Infliction of Emotional Distress (Count V)

To state a claim for intentional infliction of emotional distress ("IIED") in Pennsylvania, a plaintiff must establish four elements: (1) the conduct must be extreme and outrageous; (2) the conduct must be intentional or reckless; (3) it must cause emotional distress; and (4) the distress must be severe. Chuy v. Philadelphia Eagles Football Club, 595 F.2d 1265, 1273-74 (3d Cir. 1979). In order for a plaintiff to prevail, "[t]he conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." Cox v. Keystone Carbon Co., 861 F.2d 390, 395 (3d Cir. 1988) (citing Buczek v. First National Bank of Mifflintown, 366 Pa.Super. 551, 558, 531 A.2d 1122, 1125 (1987). The Third Circuit and courts in the Commonwealth of Pennsylvania take a conservative approach towards IIED claims. See DeWyer v. Temple Univ., CIV.A.00-CV-1665, 2001 WL 115461 (E.D. Pa. Feb. 5, 2001). As such, the burden of proof for an IIED claims is high, especially in the employment context. As the Third Circuit has stated, it is "extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery for the tort of intentional infliction of emotional distress." Cox, 861 F.2d at 395.

---

occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his *duty* to render that performance is discharged, unless the language or the circumstances indicate the contrary.

Restatement (Second) of Contracts: Discharge by Supervening Impracticability § 261 (1981). The distinction is that frustration of purpose concerns the reasons the parties entered into the contract in the first place, while impossibility concerns the duties specified in the contract.

Here, Passport challenges O'Donnell's IIED claim by asserting the conduct of which O'Donnell complains is not sufficiently extreme or outrageous to give rise to a valid IIED claim. The Court agrees. O'Donnell's IIED claim is based on her FMLA interference claim. That is, Plaintiff avers that Passport's allegedly "intentional and reckless" interference with her FMLA leave caused her severe emotional distress in that she was unable to rest and remove herself from the stress that was causing her panic attacks. This argument is insufficient. First, for the aforementioned reasons, the Court does not find that Passport interfered with O'Donnell's FMLA leave. Second, none of the conduct by Passport's representatives that O'Donnell cited at her deposition[14] can be deemed "so outrageous in character, and so extreme in degree, as to go beyond the bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." Id. Further, none of the conduct cited by O'Donnell at her deposition even relates to O'Donnell's FMLA leave, which is the only argument O'Donnell advances in her brief in opposition to Passport's summary judgment motion.

Accordingly, summary judgment is granted in favor of Passport on O'Donnell's IIED claim.

## IV. CONCLUSION

---

[14] O'Donnell was asked a series of questions as to how certain Passport representatives had inflicted emotional distress on her. With respect to Penrose, O'Donnell testified that "[h]e's not the most honest person in the world," and that "[h]e would disappear for weeks" at a time and was "[n]o help whatsoever" and failed to follow through with things O'Donnell needed done for clients. (O'Donnell Dep. 67:11- 19.) When asked for the worst instance of intentional infliction of emotional distress from Penrose, O'Donnell responded, "He wouldn't show up for meetings sometimes when he was supposed to be there. He was untruthful." (O'Donnell Dep. 67:23 - 68:2.) O'Donnell also testified that, when she was negotiating her salary with Bagwell, he failed to respond to her in what she through was an appropriate amount of time or, alternatively, he would call at night. (O'Donnell Dep. 68:14 - 69:10.) O'Donnell further testified that Joan Hall, Sr. Vice President, Clinical Orders, said she despised sales people in public meetings and tried to sell things herself so she could keep commissions. (O'Donnell Dep. 70:4-9; 72:15-20.) Finally, O'Donnell testified that Mackenzie only gave her 24 hours to decide whether to take her former position in King of Prussia at the time it was offered; was loud in sales meetings; was "not the nicest person"; that he told sales people they had to sell and if they didn't they would be eliminated; and he yelled in people's faces, although O'Donnell conceded he never yelled in hers. (O'Donnell Dep. 72:21 - 73:18.)

For the reasons set forth above, Plaintiff's Motion for Partial Summary Judgment is denied. Defendant's Motion for Summary Judgment is granted with respect to Counts I, III and V, and denied with respect to Counts II and IV.

An appropriate order follows.